UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CHARLES REED, SR., and RICHARD REED,   **No. 6:12-CV-6655-MAT-JWF**
                                       **DECISION AND ORDER**
                    Plaintiffs,


          vs.


JAMES M. SHEPPARD, Chief of Police;
POWELL TEVOR, Inv. Roch City Police
Department; OFFICER MINERKA, RPD;
and "KNOWN AND UNKNOWN" LAW/POLICE
AGENTS, STATE POLICE,

                    Defendants.

_____

## I.  Introduction

        This is an action instituted pursuant to 42 U.S.C. §§ 1981,

1983, and 1988, by <u>pro</u> <u>se</u> plaintiffs Charles Reed, Sr. ("Charles")

and Richard Reed ("Richard") (collectively, "Plaintiffs"). Charles

and Richard are the father and brother, respectively, of Charles

Quincy Reed, Jr. ("Quincy"). At the time of the events at issue,

Quincy was under parole supervision by the New York State Division

of Parole ("Parole Division"). Plaintiffs assert that Quincy's

parole officer, Curt Cashman ("Cashman"),[1] and various named and

unnamed law enforcement officers employed by the City of Rochester

Police Department ("the RPD Defendants") and the New York State

Police, violated their Fourth Amendment rights when they conducted

_____

[1]     There are discrepancies between the spelling of the names of some of the
defendants in the caption and the defendants' actual names. The caption reflects
the names as set forth in Plaintiffs' pleadings. Where the Court has been
provided with the correct spelling of individual defendants' names, it has used
these in the Decision and Order.

a warrantless search of a location they believed to be Quincy's residence.

Cashman has filed a renewed motion for summary judgment (ECF #64). The RPD Defendants also have filed a renewed motion for summary judgment (ECF #66). Plaintiffs filed a reply in opposition (ECF #69). The Court subsequently requested (ECF #71) additional briefing on certain issues as well clarification of the layout of the apartments at 532 Upper Falls Boulevard where Quincy and Plaintiffs resided. These materials were provided by Cashman (ECF #73) and the RPD Defendants (ECF #72). For the reasons discussed herein, Cashman's motion for summary judgment is granted; the RPD Defendants' motion for summary judgment is granted; and Plaintiffs' complaint is dismissed in its entirety.

## II. Factual Background and Procedural History

The following factual summary is drawn from the pleadings, deposition transcripts, and exhibits on file with the Court. Because this case is at the summary judgment stage, the Court is required to view all facts and draw all reasonable inferences in favor of the nonmoving parties. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In addition, the Court is asked to resolve issues of qualified immunity; this inquiry again requires taking the facts "in the light most favorable to the party asserting the injury." Saucier v. Katz, 533

U.S. 194, 201 (2001). Unless otherwise indicated, the facts set forth below are undisputed.

## A.  Quincy's Parole Agreement

Quincy, who has a 2007 New York State court conviction for third-degree criminal possession of a weapon and second-degree burglary, was released to the custody of the Parole Division on August 5, 2011. Prior to his release, he signed a "Certificate of Release to Parole Supervision," pursuant to which he agreed to abide by certain conditions, including the following:

> 4.    I will permit my Parole Officer to visit me at my residence and/or place or employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment or program status when circumstances beyond my control make prior discussion impossible.
> . . .
> 7.    I will not be in the company of or fraternize with any person I know to have a criminal record . . . without the permission or my Parole Officer.
> . . .
> 9.    I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer . . . .
> 13Q. I will reside only in the residence approved by the Division of Parole.

(See Exhibits ("Exs.") A & B to Declaration of Curt Cashman ("Cashman Decl.") (ECF #16-3); Ex. F to Declaration of Gary Levine,

Esq., dated August 8, 2017 ("8/8/17 Levine Decl.") (ECF #64-3),[2]
pp. 408-415 of 415).

## B. Quincy Moves Into Apartment 2 at 532 Upper Falls Boulevard

In preparation for Quincy's release to parole, his living
arrangements were coordinated between the Parole Division and his
mother, non-party Lisa Reed ("Lisa"). Lisa proposed to have Quincy
reside with her and her husband, Charles, at their residence at 14
Lavender Circle in the Town of Henrietta, New York. Because Charles
has a criminal record, including multiple felony convictions, the
NYS Parole Division denied that request. As an alternative, Lisa
proposed that Quincy reside in a building she owned located at 532
Upper Falls Boulevard in Rochester, New York.[3] The building was
vacant and the upstairs, which was residential space, had not been
renovated. Lisa stated that she was planning to divide the upstairs
into two apartments and proposed having Quincy live in the front
apartment. This apartment is denominated "Apt. 2" on the diagram
marked as Deposition Exhibit ("Dep. Ex.") #7 (ECF #64-3, p. 383 of
415). It is  on the south-side of the building and is through the

---

[2]
Exhibits A, B, C, D, E, and F to the 8/8/17 Levine Decl. are all docketed
at ECF #64-3. Page citations in the form of "p. # of #" refer to the pagination
automatically generated by the Court's CM/ECF system.

[3]
The building is located on the northwest corner of Upper Falls
Boulevard and Henry Street, and fronts on Upper Falls Boulevard.
The upstairs is accessed from a stairway running from  Henry Street
on the east side of the building up to a hallway. (See Dkt #27-3,
p. 17 of 46; and Dkt #64-2, pp. 380 & 383 of 415).

door on the left at the top of the stairwell leading from the outside door that opens onto Upper Falls Boulevard. At the time Lisa was negotiating arrangements with the Parole Division, the north-side apartment to the right at the top of the stairwell was uninhabitable. This apartment is denominated "Apt. 1" on the diagram marked as Dep. Ex. #7 (ECF #64-3, p. 383 of 415). There was a common bathroom on the second floor of 532 Upper Falls Boulevard, which had doors opening into both Apt. 1 on the north-side and Apt. 2 on the south-side. (See 8/8/17 Levine Decl., Ex. F (ECF #64-3), pp. 116-19, 197, 343-44, 362, & 383 of 415).

Upon his release to parole in August 2011, Quincy began residing in Apt. 2, the left-hand or south-side apartment at 532 Upper Falls Boulevard. Quincy resided alone in the building at 532 Upper Falls Boulevard until the end of 2011.

### C. Quincy Moves to 14 Lavender Circle and Charles Moves to 532 Upper Falls Boulevard

At the end of 2011, Quincy secured employment at a company in Henrietta, New York. He proposed moving in with his parents at 14 Lavender Circle because Lisa was willing to drive him back and forth to work. Lisa and Charles agreed, and Quincy moved to 14 Lavender Circle at the beginning of 2012.

In the course of a home visit by Quincy's former parole officer to 14 Lavender Circle, Charles was present. This parole officer reminded them that according to the terms of Quincy's

parole agreement, Charles and Quincy could not reside there together due to Charles' history of felony convictions.

Charles then moved to 532 Upper Falls Boulevard and took up residence in Apt. 2, the left-hand or south-side apartment that Quincy previously had occupied. Quincy remained at 14 Lavender Circle.

### D. Quincy Moves Back to 532 Upper Falls Boulevard

In or about March of 2012, Quincy quarreled with his sister, who also was living at Lavender Circle. Consequently, the Parole Division directed him to move out of that residence.

Quincy decided to return to 532 Upper Falls Boulevard. However, Charles and Richard[4] were living in Apt. 2 on the south-side, where Quincy had lived when he first was released on parole. By this time, Apt. 1 on the north-side apartment had been renovated, so Quincy moved into that apartment. The apartments still were connected by the common bathroom which could be accessed from both apartments. (See Dkt #64-3, pp. 19-21 & 383 of 415). Charles and Richard were both well aware of Quincy's parole status, and the fact that he was subject to a search condition. Quincy admitted that he did not "technically" get permission to live in Apt. 1 while Richard and Charles were living in Apt. 2, but Cashman

---

[4]
    At some point prior to Quincy's return to Upper Falls Boulevard, his brother, Richard, also a plaintiff in this action, had finished college and had moved into the apartment in which his father, Charles, was residing. (See Dkt #27-3, p. 34 of 46; Dkt #64-3, p. 17 of 415).

"never came in the house" to "check it." (Deposition of Charles Quincy Reed ("Quincy Dep.") at 19).

Sometime prior to May 1, 2012, Quincy requested, on behalf of the Parole Division, that Lisa draw up a lease in connection with his residence at 532 Upper Falls Boulevard. (Dkt #64-3, p. 72 of 415). On May 1, 2012, Quincy executed a lease pertaining to "apartment 1." However, Lisa had not ascribed numbers to the two apartments, and the number itself meant nothing to her. (Dkt #64-3, p. 73 of 415).

**E.   Cashman's Conducts a Home Visit in May 2012**

Cashman was assigned as Quincy's parole officer in May of 2012. The Parole Division's case management system ("CMS") indicated that, at the time of Quincy's release to parole in August 2011, only one apartment had been remodeled, it was on the front or south end of the building (Apt. 2); the CMS entry, which had been made by former parole officer Maria Rhodes, indicated that "the bedroom" was on the west side of the apartment, and that the remodeled apartment included a living room, a kitchen, an office, and a bathroom, and that Quincy's mother was continuing with the remodeling. (Transcript at 58-59, 77). On May 31, 2012, after reviewing Quincy's parole file which still indicated that Quincy was living in Apt. 2, the south-side apartment at 532 Upper Falls Boulevard, Cashman made a home visit. Cashman and Quincy only met

outside, and Cashman did not go into the building. Thus, Cashman did not see the actual arrangement of the apartments.

## F.  The Decision to Conduct a Parole Search of Quincy's Residence

In late July of 2012, Cashman had received information from a daily email bulletin distributed by the Monroe Crime Analysis Center ("MCAC")[5] that an individual named Taiquan Gatson ("Gatson"), a former State parolee, had been shot. The MCAC bulletin indicated that the person believed to have shot Gatson was named "Charles Reed." Cashman deduced that the Charles Reed referenced in the MCAC bulletin was the Charles Reed on his case load, i.e., Quincy. According to Cashman, Quincy had a history of gang involvement, and there was, at that time, a feud between Gatson's gang and Quincy's gang. Cashman determined that it was good time to search Quincy's apartment since he still might have the weapon with which Gatson was shot or a weapon for his own protection.

On July 27, 2012, Cashman and parole officer Kimberly Smith attended the roll-call of Operation IMPACT, a county-wide task force with which they were working. Cashman informed the officers present that he was planning on doing a parole search of Quincy's

---

[5]     New York State Division of Criminal Justice Services, "State-of-the-art Crime Analysis Center opens in Monroe County," http://www.criminaljustice.ny.gov/pio/press_releases/2008-11-17_pressrelease.html (last accessed Aug. 15, 2018).

apartment that evening and would appreciate assistance from the RPD.

**F.    The July 27, 2012 Search of 532 Upper Falls Boulevard**

    **1.    The Initial Entry**

Cashman, along with the RPD Defendants, arrived at 532 Upper Falls Boulevard at about 9:30 p.m. Richard testified that he first encountered Cashman and the other officers "at the outside door" to the building. (Deposition Transcript of Richard Lee Reed ("Richard Dep.") at 30, Ex. C to 8/8/17 Levine Decl. (ECF #64-3)). Cashman asked, "[W]here's your brother?" (Id. at 31). Richard said he did not know if Quincy was "up there," which led Cashman to ask, "[W]hat are you doing here?" (Id.). Richard replied that he lived there, "on the other side" and that he was going upstairs to get something from his apartment. (Id. at 31-32). Cashman said, "[']I'm [Quincy's] parole officer,['] and that's when he identified himself" and "said we're doing a routine in-home visit." (Id. at 30-31). Richard then testified as to his internal monologue or thought process during his encounter with Cashman:

> [T]hat's fine, okay, do what you have to do. I still have to be somewhere in Buffalo. This is a routine home visit, so I have no issue with me [sic], I don't care, do your home visit. [Quincy]'s on parole and this is a stipulation, it [is] part of his parole and you want to come in here, do that, whatever. It was surprising it was so many people, but I'm still going up to my apartment. I go up into my apartment . . . .

(Richard Dep. at 31).

Richard testified that Cashman began following him up the stairs from the exterior door. Richard asked him why he was "coming up here," to which Cashman replied, "this is a routine home visit. We don't need any warrants, we don't need anything, we're going up and we're going up here." (Richard Dep. at 32). Then, "[a]ll" of the officers followed Cashman, who was "kind of leading the pack[.]" (Id.). Richard testified that it "was weird," but he was "thinking at a routine home visit this is what happens, so I let them do it[.]" (Id.). Richard claimed that he "didn't let them come inside[.]" (Id.). Rather, Cashman's "words of, [']this is a routine home visit,['] . . . made [Richard] think [Cashman] can do whatever he wants to do at that point." (Id.). Richard then asked Cashman, "do you have a search warrant? Why are you coming up here?" (Richard Dep. at 32). Cashman reiterated, "we don't have to have a search warrant" because "[t]his [is] a routine home visit, I'm [Quincy's] parole officer." (Id. at 33).

While they were on the landing, Richard did not explain to the officers which apartment was his and which was Quincy's, since he "assumed" that Cashman, as Quincy's parole officer, already knew. (Richard Dep. at 33). In addition, Cashman did not ask which apartment was Quincy's. (Id.).

Richard "opened the door [to the left, leading to Apt. 2], to go and get [his] stuff." (Richard Dep. at 34). Cashman and the officers "push[ed] past [him]" into the hallway. Richard saw Quincy

"standing down here [sic] by the door to [Richard's] bedroom." (Id.). Cashman saw Quincy at the same time. (Id.). Quincy "froze" and "put his hands up[.]" (Id. at 35). Quincy was handcuffed first and then Richard was placed in handcuffs within "probably two minutes" of being upstairs; it is not clear from the deposition transcript where he was handcuffed, however. (Id.). He eventually ended up in the living room with Quincy and Quincy's girlfriend, who also had been handcuffed. (Id. at 36).

Cashman, on the other hand, testified that when he encountered Richard at the exterior door and asked if Quincy was home, Richard replied, "yeah, he should be upstairs." Richard then "walked up the stairs" and "opened the door to the left." (Transcript of Suppression Hearing dated March 8, 2013 ("Supp. Tr."), Ex. E to 8/8/17 Levine Decl. (ECF #64-3) at 74-75).[6] According to Cashman, Richard pointed out his bedroom, which was on the west side of the building (marked "Richard Bedroom" on Dep. Ex. #7), and said that the doorway at the end of the hall (which is marked "office/Quincy found" on Dep. Ex. #7) was Quincy's bedroom. (Supp. Tr. at 81). Cashman knocked on the door; Quincy answered the door and looked like he had perhaps just been sleeping. He was wearing boxer shorts

---

[6] Cashman testified at the suppression hearing held in connection with Quincy's subsequent arrest on charges of second-degree and third-degree criminal possession of a weapon based on the discovery of a handgun during the July 27, 2012 parole search.

and a t-shirt. There was a futon in the room on which Quincy's girlfriend was lying.

Cashman testified that as soon as he walked through the door to the room marked "office," he saw a little fake plant in a pot on a stand; inside the pot was a small black pistol, with the magazine "sort of out of it." (Supp. Tr. at 26). Cashman then turned the scene over to the RPD because there was a possible new violation of law. Cashman assisted the RPD officers with a full search of the room and found a pair of pants and a wallet with Quincy's driver's license in it. (Supp. Tr. at 44). However, Cashman did not assist the RPD officers in searching the remainder of Apt. 2, and left about a half-hour after he arrived. (Supp. Tr. at 37).

Quincy testified to a slightly different version. He related that he and his girlfriend, Brittany Breedlove, were in the room marked "office" on Dep. Ex. #7 sleeping on a pull-out futon. Quincy was sitting on the futon when Cashman came into the room. (Quincy Dep. at 26-28). Quincy said he had woken up when he heard Richard arguing with the officers outside in the hallway.

Richard testified that he remained upstairs in the living room, handcuffed, until the point that Cashman and the RPD Defendants found the handgun in the room denominated as "office" on Dep. Ex. #7. (Richard Dep. at 37). After that, Richard recalled, a black detective in a suit asked him if he would consent to a search of the entire premises; Richard refused, and he was taken

downstairs and placed in a patrol car. Quincy and his girlfriend already had been brought downstairs. (Richard Dep. at 39). Also, prior to Richard being removed from the apartment, Charles and his grandson (Quincy's son) arrived at the residence. Charles and the grandson were allowed to remain upstairs during the search. According to Charles, he heard Cashman say to the RPD officers that "in order to do the proper search you have to get, you have to do the proper paperwork," and "I don't have no more control over nothing there because I found what I came and look for." (Deposition of Charles Reed, Sr. ("Charles Dep.") at 63, 91). Charles testified that Cashman then left and the search continued.

Charles testified that Quincy was over in his (Charles's) office on the night of July 27, 2012, because Charles had an air conditioner in that room, and Quincy did not have cable in his apartment, so he and his girlfriend were "just over there chilling. . . ." (Charles Dep. at 58). Charles admitted that Quincy would "be over there [in Charles and Richard's apartment] all the time." (Id. at 62). Charles testified, "We watched TV together, we conspire, you what I'm saying, my son, so he'd be over there all the time. You know, his brother's there." (Id.).

Richard remained in the patrol car for a couple of hours while the apartment was searched. He was not placed under arrest. During this time, he observed a safe being removed from the apartment by the RPD Defendants. A narcotics dog had alerted on the safe, which

had been in the closet in the room where Quincy, his girlfriend, and the gun were found. However, the safe was empty. According to Charles, Investigator Powell of the RPD seized the safe. (Charles Dep. at 88).

## III. Summary Judgment Standard

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007). If the movant sustains his initial burden of establishing the absence of any genuine issue of material fact, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), the nonmovant in turn must produce evidence that would support a jury verdict, id. In other words, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) (citing FED. R. CIV. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) (citing Anderson, 477 U.S. at 248;

other citation omitted). Summary judgment must be granted if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The Second Circuit has held that where, as here, the nonmovant is proceeding pro se, a court should read that party's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

## IV.  The Summary Judgment Motions

### A.  All Claims Against Former RPD Chief Sheppard Are Dismissed for Lack of Personal Involvement

Sheppard, the former chief of police of the RPD, has moved for summary judgment on the basis that Plaintiffs have failed to establish his personal involvement in the alleged constitutional violations. Plaintiffs have not meaningfully opposed this argument.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Hence, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, a supervisory defendant may be considered "personally involved" if (1) the

defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986)).

In his supporting declaration (ECF #66-12), Sheppard avers that he was the police chief from November 11, 2010, until December 20, 2013, and that he is now retired. Sheppard asserts that he was not consulted about, and had no involvement in, any of the events of July 27, 2012, and did not learn of them until after he had retired. As Sheppard notes, he is mentioned in one paragraph of the complaint and only by reference to his status, the supposed duties of his former office, and his residence. There are no allegations of negligence or other culpability, direct or indirect, on Sheppard's part. Nor were any such allegations made by any of the individuals deposed in this action (i.e., Charles, Quincy, Richard, and Lisa Reed).

It is well settled that "if the defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the "[departmental] chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." Tafari v. McCarthy, 714 F. Supp.2d 317, 343 & n. 9 (N.D.N.Y. 2010) (citing Polk County v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); other citations omitted); see also Felix-Torres v. Graham, 687 F. Supp.2d 38, 61 (N.D.N.Y. 2009) ("A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement."). The Court agrees that dismissal of Sheppard as a defendant is proper because Plaintiffs have failed to allege that he "fail[ed] to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts," Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002) (citations omitted), much less that there is "an affirmative causal link" between the Sheppard's alleged inaction or malfeasance and their injuries, id.

**B. The Claims Against Unidentified "Known and Unknown Law/Police Agents, State Police" Are Dismissed as Untimely**

On December 26, 2012, the Court (Skretny, D.J.), in an order granting Plaintiffs in forma pauperis status, directed Plaintiffs to conduct discovery in order to identify any unnamed "known and

unknown" defendants and to amend their complaint to include them prior to the expiration of the statute of limitations. The RPD Defendants argue that Plaintiffs' failure to do so warrants dismissal of all claims against any "known and unknown" defendants.

As Section 1983 does not contain a statute of limitations governing actions brought under it, courts must "borrow" an appropriate state law statute of limitations. Lounsbury v. Jeffries, 25 F.3d 131, 133 (2d Cir. 1994) (collecting cases). The Supreme Court has directed that for statute of limitations purposes, Section 1983 claims are best characterized as personal injury actions. Wilson v. Garcia, 471 U.S. 261, 272 (1985), superceded by statute on other grounds as recognized in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 377-81 (2004). Where, as here, "state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." Owens v. Okure, 488 U.S. 235, 249-50 (1989). New York's general statute for such cases, codified at New York Civil Practice Law and Rules § 214(5), is three years. See Owens, 488 U.S. at 249-50 (finding that New York Court of Appeals correctly applied New York's three-year statute of limitations governing general personal injury actions to § 1983 claim).

The limitations period on Plaintiffs' Section 1983 claims commenced on July 27, 2012, when the warrantless search was

conducted. The limitations period therefore expired on July 27, 2015, making Plaintiffs' claims against the unknown defendants untimely.

"It is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued[.]" Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (per curiam) (quotation omitted; brackets in original). Courts typically refrain from dismissing suits against unknown or so-called "John Doe" defendants "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials[.]" Davis v. Kelly, 160 F.3d 917, 921 (2d Cir. 1998). Here, Plaintiffs have had the opportunity to participate in discovery and have had ample time to identify and serve any "known and unknown" defendants. To date, Plaintiffs have not done so. Any claims against the "known and unknown" defendants are now untimely by more than three years. Accordingly, the Court dismisses all claims against any "known and unknown" defendants with prejudice. See, e.g., Tapia-Ortiz, 171 F.3d at 152 (pro se plaintiff's "failure until two years after the expiration of the statute of limitations period to name specifically in his complaint the officers who allegedly violated his rights" was "fatal" to civil rights claim).

**C.   The Fourth Amendment Claims Against Cashman, Minurka, Jimenez, and Powell Are Dismissed As a Matter of Law**

### 1.   The Fourth Amendment

The broad legal principles concerning entry by state officials into a home are "well settled[.]" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The Supreme Court has unequivocally held that "under the Fourth and Fourteenth Amendments . . . a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth, 412 U.S. at 219 (quoting Katz v. United States, 389 U.S. 347, 357 (1967); other citations omitted). "Entrance by the police into a home—which constitutes a search for Fourth Amendment purposes—is permissible only where justified by a warrant, exigent circumstances, or valid consent." Smith v. City of Wyoming, 821 F.3d 697, 709 (6th Cir. 2016) (citing Payton v. New York, 445 U.S. 573, 590 (1980) (in the absence of "exigent circumstances," requiring a warrant to search a home); Schneckloth, 412 U.S. at 222 (noting the validity of "a search [of a home] authorized by consent")).

### a.   The Consent Exception to the Warrant Requirement

The prohibition against warrantless searches does not apply to "situations in which voluntary consent has been obtained, either from the individual whose property is searched," Illinois v. Rodriguez, 497 U.S. 177, 181 (1990), (citation omitted), "or from

a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," id. (citation omitted). The Supreme Court explained in United States v. Matlock, 415 U.S. 164 (1974), that "[c]ommon authority is . . . not to be implied from the mere property interest a third party has in the property, . . . but rests on mutual use of the property by persons generally having joint access or control for most purposes. . . ." Id. at 171, n. 7 (internal citations omitted). "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant[.]" Georgia v. Randolph, 547 U.S. 103, 109 (2006) (citing Rodriguez, 497 U.S. at 186).

### b. The Probation/Parole Exception

"Another exception to the principle that warrantless searches of a home are unreasonable relates to persons who are on probation or parole." Smith v. City of Santa Clara, 876 F.3d 987, 991 (9th Cir. 2017) (citing Griffin v. Wisconsin, 483 U.S. 868, 880 (1987); United States v. Knights, 534 U.S. 112, 118–19 (2001)). In Griffin, the Supreme Court justified the warrantless search of a probationer's home because the State's interest in supervising a probationer gave rise to "special needs" permitting a "degree of impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. at 875. These "special

needs" rendered the warrant requirement impracticable. Id. at 875-78. In Knights, the Supreme Court found a warrantless search of a probationer's home reasonable even though it was conducted by a sheriff's deputy rather than a probation officer and the purpose of the search was not to supervise the probationer but to investigate a specific crime. Knights, 534 U.S. at 121. Rather than relying on either the special needs rationale or the consent exception line of cases, the Supreme Court began by observing that "[t]he touchstone of the Fourth Amendment is reasonableness[,]" which "is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). An individual's status as a probationer or parolee "informs both sides of that balance." Id. at 119. Both probationers and parolees "are on the 'continuum' of state-imposed punishments." Id. "On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." Id.

After balancing the respective interests of the State and the individual, the Supreme Court concluded that a warrantless search of the home of a probationer subject to a search condition is reasonable as to the probationer if the authorities have "reasonable suspicion" that criminal conduct was occurring. Id. at

121. Subsequently, in <u>Samson v. California</u>, 547 U.S. 843, 850 (2006), the Supreme Court held that *no* individualized suspicion at all was required to search a California state parolee's person when he had accepted a condition agreeing to searches with or without a warrant, and with or without cause. <u>Id.</u> at 846 (citation omitted). In both <u>Knights</u> and <u>Samson</u>, "the Supreme Court based its conclusion on the fact that a probationer or parolee has a diminished expectation of privacy, especially when he accepts probationary conditions that explicitly and unambiguously inform him of a police officer's authority to search his property." <u>Sharp</u>, 871 F.3d at 918 (citing <u>Knights</u>, 534 U.S. at 119-20; <u>Samson</u>, 547 U.S. at 851-52).

## 2. Overview of the Parties' Arguments

This is not a run-of-the-mill parole search case, because the plaintiffs here, Richard and Charles, are not parolees. Rather, they were co-tenants or co-residents with a parolee (Quincy). Plaintiffs' basic contention is that what is permissible as to parolees is not permissible as against non-parolees because a non-parolee should not be made to suffer the consequences of a parole search directed at a parolee. Plaintiffs argue that Cashman and the RPD Defendants actions were unreasonable because they searched an apartment that they knew did not belong to Quincy, the parolee. Plaintiffs further contend that the search was unreasonable because Cashman and the RPD Defendants did not have their consent.

Cashman and the RPD Defendants raise similar arguments. They contend that Richard provided consent to enter the apartment and search the room in which Quincy was found by virtue of his words and actions.[7] Because Charles was absent, they argue, he could not withhold consent and they were not required to obtain his consent. In the alternative, the contend that <u>Georgia v Randolph</u>, <u>supra</u>, does not apply in the parole search context and that because Richard and Charles knowingly co-habited with a parolee, they had a reduced expectation of privacy in their home, which was outweighed by the important State interests underlying Quincy's parole search condition. In light of this reduced expectation of privacy, they argue, search was reasonable as to Richard and Charles. Cashman and the RPD Defendants also contend that even if a constitutional violation occurred, they are entitled to qualified immunity because the law is in flux concerning the issues raised in the complaint.

### 3.  The Qualified Immunity Test

State officials can demonstrate they are entitled to qualified immunity from law suits arising from their discretionary actions in two ways: "First, they are immune from liability if their conduct does not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have

---

[7]

Cashman asserts that he was not involved in the search of the remainder of the apartment that ensued after Richard specifically withheld consent.

x

x

Cashman and the RPD Defendants raise similar arguments. They contend that Richard provided consent to enter the apartment and search the room in which Quincy was found by virtue of his words and actions.[7] Because Charles was absent, they argue, he could not withhold consent and they were not required to obtain his consent. In the alternative, the contend that <u>Georgia v Randolph</u>, <u>supra</u>, does not apply in the parole search context and that because Richard and Charles knowingly co-habited with a parolee, they had a reduced expectation of privacy in their home, which was outweighed by the important State interests underlying Quincy's parole search condition. In light of this reduced expectation of privacy, they argue, search was reasonable as to Richard and Charles. Cashman and the RPD Defendants also contend that even if a constitutional violation occurred, they are entitled to qualified immunity because the law is in flux concerning the issues raised in the complaint.

### 3.  The Qualified Immunity Test

State officials can demonstrate they are entitled to qualified immunity from law suits arising from their discretionary actions in two ways: "First, they are immune from liability if their conduct does not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have

---

[7]

Cashman asserts that he was not involved in the search of the remainder of the apartment that ensued after Richard specifically withheld consent.

known." <u>Moore v. Vega</u>, 371 F.3d 110, 114 (2d Cir. 2004) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); citation omitted). Second, State officials will be entitled to qualified immunity "if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." <u>Id.</u> (citation omitted). In other words, State officials are immune from suit "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987).

While the Supreme Court "'do[es] not require a case directly on point'" for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)). Last year, in 2017, the Supreme Court "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017) (<u>per</u> <u>curiam</u>) (quoting <u>al-Kidd</u>, 563 U.S. at 742). Rather, "the clearly established law must be 'particularized' to the facts of the case." <u>Id.</u> (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)). That is, the plaintiff "must point to prior case law that articulates a constitutional rule specific enough to alert *these* [officers] *in this case* that *their particular conduct* was unlawful." <u>Sharp</u>, 871 F.3d at 911 (citing <u>Wilson v. Layne</u>, 526 U.S.

603, 617 (1999) (prior precedent must be "controlling" from the Supreme Court or the Circuit court in the relevant jurisdiction, or otherwise embraced by a "consensus" of courts outside the relevant jurisdiction); emphases in original). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson, 483 U.S. at 639.

"In a damages action asserting an illegal search, '[t]he relevant question . . . is . . . whether a reasonable officer could have believed [the] search to be lawful, in light of clearly established law and the information the searching officers possessed.'" Moore v. Vega, 371 F.3d 110, 115 (2d Cir. 2004) (quoting Anderson, 483 U.S. at 641 (ellipses and brackets in original); citing Castro v. United States, 34 F.3d 106, 112 (2d Cir. 1994) ("Officials are entitled to qualified immunity when their decision was *reasonable*, even if mistaken.") (emphasis in original); Butz v. Economou, 438 U.S. 478, 507 (1978) (stating that federal officials are shielded by qualified immunity from mere mistakes in judgment regardless of whether the mistake is one of fact or law)).

### 4. Analysis

#### a. It Was Reasonable for Cashman and the RPD Defendants to Believe that Apt. 2 Was Quincy's Residence

"Generally, a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides, even if others also reside there. But they have to be reasonably sure that they are at the *right* house." Motley v. Parks, 432 F.3d 1072, 1079 (9th Cir. 2005) (emphasis in original), overruled on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012). Here, Cashman and the RPD Defendants believed they were entering the residence of Quincy, a parolee in Cashman's legal custody,[8] when they followed Richard inside of 532 Upper Falls Boulevard and up the stairs, and went into the south-side apartment on the left at the top of the stairs. "If such belief was reasonable, qualified immunity protects them from liability, even if that belief was mistaken." Moore, 371 F.3d at 117 (citing Ehrlich v. Town of Glastonbury, 348 F.3d 48, 60–61 (2d Cir. 2003) (police officers could have believed that warrantless entry based on third-party consent was lawful given

---

[8] "A parole officer has legal custody of the parolee to whom he is assigned, which imposes on the officer a duty to monitor that parolee's adherence to the terms of his parole." Moore, 371 F.3d at 116 (citing United States v. Thomas, 729 F.2d 120, 123 (2d Cir. 1984) (citing N.Y. Exec. Law § 259-i(2)(b) (McKinney 1982)).

conservator's letter granting permission to use force to enter)).
The Court finds that Cashman's belief was reasonable. The last
entry in the Parole Division's CMS system was that Quincy's
approved residence was the south-side or left-hand apartment
(denominated Apt. 2 on Dep. Ex. #7), and that Apt. 1 was not
renovated or habitable. Quincy admitted that he did not update the
Parole Division about his change in living arrangements when he
returned to 532 Upper Falls Boulevard in 2012 and moved into
Apt. 1; nor was the Parole Division updated that Quincy's mother
had finished remodeling Apt. 1. Thus, when Cashman made a home-
visit in May of 2012, the only information available in CMS was
that there was one habitable apartment at 532 Upper Falls
Boulevard, Apt. 2. Moreover, Quincy could have, but did not, notify
Cashman during that home visit that he actually was living in
Apt. 1, not Apt. 2.

The facts surrounding where Quincy was located at the time
Cashman and the RPD Defendants entered Apt. 2 are disputed. Cashman
testified, as noted above, that Richard directed him to the door at
the end of the hallway (the room marked "office") and said that was
Quincy's bedroom. Cashman also testified that he "went straight to
Quincy's bedroom, which is the first door on the south side,
straight at the end of the hall." (Supp. Tr. at 25). Cashman
knocked on the door, and Quincy answered. Cashman testified that he
knew it was Quincy's bedroom because Quincy's former parole officer

Maria Rhodes ("Rhodes") had made a notation in CMS of exactly where Quincy's bedroom was in relations to his brother's bedroom. (Id.). However, that does not make sense, because at the time that Rhodes was supervising Quincy, in 2011, he was not living with Richard. In addition, the text of the CMS entry by Rhodes, which was read into the record at Quincy's suppression hearing, refers to "[t]he bedroom" in Apt. 2, not multiple bedrooms. "[T]he bedroom" in Apt. 2 is not at the end of the hallway; it is the second door on the west or right side of the hallway. (Dep. Ex. #7 (ECF #64-3, p. 383 of 415)). Further inconsistency is found in Cashman's declaration submitted in connection with the prior summary judgment motion wherein Cashman said that he had a "prior meeting with [Quincy] in that apartment." (Cashman Decl. (ECF #16-3) ¶ 17). However, Cashman admitted at Quincy's suppression hearing that he never had been inside of 532 Upper Falls Boulevard prior to July 27, 2012. (Supp. Tr. at 61). When Cashman went to that location at the end of May 2012, he spoke with Quincy outside by the front door. (Id. at 71).

For his part, Quincy testified that he was in the room marked "office" when Cashman entered the room, and that he was sitting on the futon wearing a t-shirt and boxer shorts, and had just woken up.

Richard, on the other hand, testified that Quincy was out in the hallway near the doorway to the room marked "Richard Bedroom"

on Dep. Ex. #7 when Cashman and the RPD Defendants pushed past him and went into the "office."

Notwithstanding all of the foregoing factual inconsistencies about where Quincy was located when Cashman and the RPD Defendants first entered Apt. 2, it is undisputed that the last information provided by Quincy to the Parole Division was that he did, in fact, reside in Apt. 2. As a condition of his parole, Quincy was required to allow his parole officer to visit him at his residence. By virtue of the Certificate of Release to Parole Supervision, which Quincy signed, he agreed to permit his parole officer to conduct a "search and inspection of [his] person, residence and property" and to "discuss any proposed changes in [his] residence . . . with [his] Parole Officer." Ex. A to Cashman Decl. (ECF #16-3). Prior to July 27, 2012, Quincy admittedly did not notify the Parole Division that he had moved into Apt. 1, and none of his family members did so either. On the night of July 27, 2012, neither Quincy nor Richard informed Cashman or the RPD Defendants that Quincy did not live in Apt. 2 but instead lived in Apt. 1. On the present record, the Court finds that Cashman had probable cause to believe that he was in Quincy's apartment.

The RPD Defendants, in turn, were reasonably entitled to rely on the information obtained from Cashman about the location of Quincy's residence. See Motley, 432 F.3d at 1081 ("Effective and efficient law enforcement requires cooperation and division of

labor to function. For that reason, law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers.") (citing Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 568 (1971); other citation omitted).

### b. Cashman and the RPD Defendants Had Reasonable Suspicion to Search the "Office" in Apt. 2

With regard to the search of the "office" and the remainder of Apt. 2, Cashman and the RPD Defendants argue that they had "reasonable suspicion" to conduct it, based on the MCAC bulletin indicating that a Charles Reed, whom Cashman believed was his assigned parolee, Quincy, was responsible for a gang-related shooting. Cashman and the RPD Defendants also contend that even without any suspicion, the search was reasonable based on Quincy's acceptance of a search condition as part of his parole agreement.

"Although probationers and parolees are subject to 'a degree of impingement upon privacy that would not be constitutional if applied to the public at large,'" United States v. Newton, 369 F.3d 659, 665 (2d Cir. 2004) (quoting Griffin, 483 U.S. at 875), "the law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement,'" id. (quoting Griffin, 483 at 873). New York State Division of Parole regulations state that "[a] releasee will permit his parole officer to visit him at his residence and/or place of employment and will permit the search and inspection of his person, residence and property." N.Y. COMP. CODES

R. & Regs. tit. 9, § 8003.2(d). Quincy was fully aware that the conditions of his parole supervision included home visits and searches, as demonstrated by his signature on the document specifically informing this condition of his parole, he had a "severely diminished expectation of privacy with respect to any home visit by a [parole] officer." United States v. Reyes, 283 F.3d 446, 461 (2d Cir. 2002). Caselaw in this Circuit indicates that a parolee's significantly diminished expectation of privacy follows him to premises other than his own residence. See United States v. Viserto, 391 F. App'x 932, 934 (2d Cir. 2010) (unpublished opn.) (stating that "even if Viserto[, a parolee,] has standing to challenge the entry of his wife's home, he cannot claim a legitimate expectation of privacy against a parole search in any premises he used as a residence, particularly where the purpose of the entry was not 'arbitrary, capricious, or harassing'") (internal citation and other quotation omitted); United States v. Pabon, 603 F. Supp.2d 406, 417 (N.D.N.Y. 2009) (noting that recognizing a parolee's privacy interest in the home of a third party "would grant the [parolee] broader rights in the third party's home than he would have in his own home" and holding that "regardless of whether Pabon was living in Yager's apartment, an overnight guest, or merely there temporarily, he did not have an expectation of privacy in Yager's apartment that society would recognize as legitimate") (quotation omitted).

Nonetheless, the New York Court of Appeals has "cautioned that standard release certificates should 'not . . . be taken as an unrestricted consent to any and all searches.'" Newton, 369 F.3d at 665 (quoting People v. Huntley, 43 N.Y.2d 175, 182 (1977); ellipsis in original)). Huntley held that whether a particular warrantless parole search "was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty. It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances." Huntley, 43 N.Y.2d at 181. In United States v. Grimes, 225 F.3d 254 (2d Cir. 2000) (per curiam), the Second Circuit "held that Huntley's articulation of a reasonable relationship rule for warrantless parole searches is 'coextensive with the requirements of the Fourth Amendment.'" Newton, 369 F.3d at 666 (quoting Grimes, 225 F.3d at 259 n. 4).

Applying Huntley to this case, the Court finds that the reasonable relationship requirement was satisfied. "'[T]he obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes' is part of a parole officer's duty." Newton, 369 F.3d at 666 (quotation omitted). Moreover, parole officers have a duty "to investigate

-33-

whether a parolee is violating the conditions of his parole, . . .
one of which, of course, is that the parolee commit no further
crimes[.]" Reyes, 283 F.3d at 459 (citations omitted). Thus, once
Cashman received information that Quincy might have been involved
in the shooting of a member of a rival gang, it was a reasonable
exercise of his parole duty to search Quincy's apartment to detect
whether he was in possession of a firearm, which was a violation of
his parole conditions. See Newton, 369 F.3d at 666 (warrantless
search bore  reasonable relationship to the parole officers'
performance of their duty inasmuch as officers had received
information that parolee had a gun in his residence and had
threatened his mother and her husband). Moreover, the information
Cashman received from the county-wide crime analysis center was
consistent with reasonable suspicion. See United States v. Sokolow,
490 U.S. 1, 7 (1989) (reasonable suspicion requires an officer to
"be able to articulate something more than an
inchoate and unparticularized suspicion or hunch") (internal
quotation marks and quotation omitted).

"[N]either Huntley nor Grimes holds that consent, whether
obtained pursuant to parole regulation [N.Y. COMP. CODES R. & REGS.
tit. 9,] § 8003.2 or otherwise, is required in addition to a
reasonable relationship to the parole officer's duty to justify a
warrantless parole search." Newton, 369 F.3d at 666. Nevertheless,
the New York State Division of Parole's Policy and Procedures

Manual provides "that consent [of the parolee or another adult member of the household] must be obtained to support the warrantless search of a parolee's residence." Id. (citation omitted). Here, the consent requirement clearly was satisfied by Quincy's signed certificate of release. Id. (citing <u>People ex rel. McNeil v. New York State Bd. of Parole</u>, 87 Misc.2d 497, 501 (N.Y. Sup. Ct. 1976) (holding that a parolee's signed certificate of release "expressly consents to a search of his person or residence as a condition of his parole"), <u>rev'd</u> <u>on</u> <u>other grounds</u>, 394 N.Y.S.2d 230 (2d Dep't 1977)).

       c.    **The Law Is Not Clearly Established, After <u>Samson</u>, on the Degree of Suspicion Required to Conduct a Warrantless Parole Search in New York**

Alternatively, the Court finds that Cashman and the RPD Defendants are entitled to qualified immunity because, following the Supreme Court's 2006 decision in <u>Samson</u>, <u>supra</u>, it is not clearly established that some particularized suspicion is required before searching a parolee or his residence. The California statute at issue in <u>Samson</u> required parolees to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and *with or without cause*." CAL. PENAL CODE ANN. § 3067(a)(2000) (emphasis supplied). New York's certificate of parole release, on the other hand, requires a parolee to agree to "search and inspection of his person, residence and property," N.Y. COMP.

-35-

CODES R. & REGS. tit. 9, § 8003.2(d), but it does not clearly and unambiguously require parolees to waive a suspicionless searches. In <u>Samson</u>, the California parolee's acceptance of a "clear and unambiguous" suspicionless-search provision was critical to the Supreme Court's holding that the parolee "did not have an expectation of privacy that society would recognize as legitimate." <u>Samson</u>, 547 U.S. at 852 (citation omitted). "Neither the Supreme Court nor the Second Circuit has ever approved the search of parolee's residence absent reasonable suspicion or a clear and unambiguous waiver of suspicionless searches." <u>Black v. Petitinato</u>, No. 16CV2320BMCRLM, 2018 WL 1115692, at *4 (E.D.N.Y. Feb. 27, 2018).

Since <u>Samson</u>, however, "[c]ourts disagree as to whether or not the relevant parole regulation in New York is similar to the California statute at issue in Samson, and thus there is no consensus on whether or not Samson applies to cases involving New York parolees." <u>United States v. White</u>, 622 F. Supp.2d 34, 41 (S.D.N.Y. 2008) (collecting cases); <u>accord</u> <u>Black</u>, 2018 WL 1115692, at *5 (stating that "[n]on-precedential Second Circuit decisions since <u>Samson</u> have hinted in both directions" (collecting cases)); <u>see also</u> <u>United States v. Chirino</u>, 483 F.3d 141, 150 (2d Cir. 2007) (concurring opn.) (stating that propriety of suspicionless searches of probationers, who generally have greater expectations of privacy than parolees, is an open question in the Second Circuit after

Samson). Thus, even assuming that the information possessed by Cashman was inconsistent with reasonable suspicion, this "uncertainty in the caselaw means that a reasonable parole officer conducting the search at issue here without reasonable suspicion would not necessarily have understood [his] actions to be unlawful." Black, 2018 WL 1115692, at *5 (citing Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007)). Because "[i]t is unclear whether the Second Circuit's decisions are consistent with the Supreme Court's decision in Samson," "the right is not 'clearly established' for qualified-immunity purposes." Id. (citing Reichle v. Howards, 566 U.S. 658, 667-68 (2012)).

Furthermore, the RPD Defendants are likewise entitled to qualified immunity. The Second Circuit has held that assistance by police officers during an otherwise reasonable search by parole officers does not render the search unreasonable. See Reyes, 283 F.3d at 464 (concluding that the law permits a "coordinated effort" between federal probation officers and police officers to visit a defendant on supervised release and search the releasee's neighbor's house, respectively, "as long as the probation officers are pursuing legitimate probation-related objectives"); Newton, 369 F.3d at 667 ("[W]e reiterate Reyes's rejection of stalking horse challenges and conclude that police presence . . . did not render the warrantless search constitutionally unreasonable."). "A reasonable police officer in this situation would not have

understood the parole officer's actions to be unlawful, and, under Second Circuit precedent, the police officers were entitled to assist with a lawful parole search." Black, 2018 WL 1115692, at *5-6.

### d. The Law Was Not Clearly Established That Plaintiffs' Consent Was Necessary Prior to Conducting the Parole Search

As noted above, Quincy's consent to the parole search was obtained by means of his signed certificate of release agreeing to certain conditions. In addition, there is no indication from his deposition testimony that he raised any objection to the search. Plaintiffs argue, however, that Cashman and the RPD Defendants were required to obtain their personal consent to conduct a warrantless search. In essence, they argue that Georgia v. Randolph, supra, co-resident consent exception should apply in the context of individuals who co-reside or co-habit with parolees.

In Randolph, the Supreme Court addressed a situation where police officers had entered a home, over respondent Randolph's objection, based upon the consent of his wife. In finding the wife's consent invalid as to Randolph, the Supreme Court reasoned that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the

absence of any consent at all." Randolph, 547 U.S. at 114. The Supreme Court held that "a *physically present* co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to *him*." Id. at 106 (emphases supplied). A party—whether possessing actual authority or apparent authority—cannot authorize a search as to a physically present and objecting tenant. Randolph, 547 U.S. at 120.

The courts to have considered the import of Randolph in the context of individuals who co-habit or reside with a parolee or probationer have reached differing conclusions. See Frego v. Kelsick, 690 F. App'x 706, 708-09 (2d Cir. 2017) (unpublished opn.); Sharp v. County of Orange, 871 F.3d 901, 918-19 (9th Cir. 2017); Smith v. City of Santa Clara, 876 F.3d 987, 994 (9th Cir. 2017), aff'g Smith v. City of Santa Clara, No. 5:11-CV-03999-LHK, 2013 WL 164191 (N.D. Cal. Jan. 15, 2013); Barajas v. City of Rohnert Park, 159 F. Supp.3d 1016, 1031-32 (N.D. Cal. 2016); Thornton v. Lund, 538 F. Supp.2d 1053, 1058 (E.D. Wisc. 2008); Lipford v. City of Chicago, No. 15-cv-6988, 2018 WL 3474534, at *5 (N.D. Ill. July 19, 2018); Taylor v. Brontoli, No. 1:04-CV-0487 GLS/DRH, 2007 WL 1359713, at *2 (N.D.N.Y. May 8, 2007). The Smith panel upheld the district court's dismissal of the plaintiff's Section 1983 claims on qualified immunity grounds, reasoning that it was not clearly established that Randolph created an exception

to the probation-search rule. <u>Id.</u> at 990.[9] The plaintiff in <u>Smith</u>
was the mother of a probationer whom the police believed was
involved in a crime. The police came to the mother's house, which
the probationer had indicated was her residence on various items of
official paperwork, and executed a warrantless search. The district
court acknowledged that, with regard to the plaintiff's refusal to
consent to the search, by the time of the incident in 2010,

> the Supreme Court had decided <u>Georgia v. Randolph</u>, 547
> U.S. 103 . . . , which established that where two
> residents are both present and one consents while the
> other objects to the search, the objection trumps the
> consent. However, it was not clear at the time—and
> indeed, is still unclear—whether this rule applies to a
> probation search. Indeed, [c]ourts have explained again
> and again that probation and parole are special
> situations with needs that differ from other types of
> situations. Thus, officers would be reasonable to believe
> that a rule that applies to searches generally does not
> apply the same way to probation searches. At the very
> least, the <u>Randolph</u> rule is in tension with the rule
> allowing probation searches on a finding of probable
> cause that the target lives at the address. It was thus
> not clearly established that [the p]laintiff's refusal
> could or should trump the consent included as a condition
> of [her daughter]'s probation. Because it was not clearly
> established that the <u>Randolph</u> rule would apply in such a
> situation, the officers are immune from suit on this
> issue.

<u>Smith</u>, 2013 WL 164191, at *8 (internal citation omitted); <u>see also</u>
<u>Barajas</u>, 159 F. Supp.3d at 1033-34 (finding that <u>Randolph</u> applied,

---

[9]
    In upholding the jury verdict in the defendants' favor on the plaintiff's
California state-law civil rights claims, to which qualified immunity did not
apply, the Ninth Circuit observed that under the Supreme Court's caselaw,
probation (and parole) searches are analyzed differently than consent searches,
and therefore "<u>Randolph</u>, which creates an exception to the consent rule, is not
directly applicable." <u>Smith</u>, 876 F.3d at 994.

but granting summary judgment in defendants' favor; homeowners' right to not have police conduct probation search of their home over their objections while probationer resided with them was not clearly established at time of the search, and therefore, police officers were entitled to qualified immunity in § 1983 action alleging that search over their objections violated the Fourth Amendment); Lipford, 2018 WL 3474534, at *5 ("[T]he law remains unsettled (and thus could not have been settled in 2013) on the question of exactly how living with a probationer affects a non-probationer's expectation of privacy; some courts have found a reduced expectation of privacy for people who know about their roommate's probation conditions. . . . Given the unsettled state of the law on this issue, [the plaintiff] could not show that his right to be free from entries to his home based upon reasonable suspicion of a probation violation by his [probationer] roommate—if such a right exists—was clearly established in September 2013."); Taylor, 2007 WL 1359713, at *1 n. 4 (refusing to extend Randolph where "it [wa]s undisputed that [the non-consenting co-inhabitant] was aware that [the other co-inhabitant] was on probation and that her trailer was subject to searches").

Although, under the Supreme Court's qualified immunity precedent, the Court has the authority to decide the underlying constitutional question of whether the Fourth Amendment permits a parole search where another resident of the house is present and

objects, the Court does not believe that now is the time to do so. Moreover, the Court finds that this case does not present the appropriate vehicle for developing the law. Accordingly, the Court finds that Cashman and the RPD Defendants are entitled to qualified immunity on Plaintiffs' claim that the refusal to consent by Richard, as a present and objecting co-tenant, overrides the consent given by Quincy as a condition of his parole.

**V.    Conclusion**

For the foregoing reasons, Cashman's motion for summary judgment (ECF #64) is granted; the RPD Defendants' motion for summary judgment (ECF #66) is granted; and Plaintiffs' complaint (ECF #1) is dismissed in its entirety. The Clerk of Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**
_____
                HON. MICHAEL A. TELESCA
                United States District Judge

Dated:    August 17, 2018
          Rochester, New York.